JOHN F. TUCKER, plaintiff in error, *vs.* HENRY L. TOOMER, defendant in error.

NOTE.—WARNER, C. J., did not preside in this case.

This South Carolina mortgage sought to be enforced on lands lying in Georgia, can only be regarded (looking to the case made by the record) as a *security* for the payment of the debt due by Tucker to Toomer, for the purchase of a large number of slaves. The condition of the mortgage being broken by Tucker, the legal title was thereupon vested in the mortgagee, only for specified purposes, and it does not, therefore, operate as a payment.

The absolute ownership of these negroes (the possession never having changed after the sale) continued in Tucker until by the Acts of the United States Government they were made free, [and] the loss must be borne by him.

The facts of this case would not justify an apportionment of said loss between the vendor and vendee.

This case is fully covered by Freeman *vs* Bass, decided by this Court at June Term, 1866.

Foreclosure of Mortgage. In Chatham Superior Court. Tried before Judge FLEMING, January Term, 1867.

The points involved in this case arose upon the following state of facts:

On the first day of December, 1857, in South Carolina, John F. Tucker and Henry J. Dickinson, of Savannah, Georgia, executed and delivered their joint and several bond, in the usual form, in the sum of $107,300.00 to Henry Laurens Toomer, of Charleston, South Carolina. The condition of said bond was that said Tucker and Dickinson should pay, or cause to be paid, to said Toomer, his executors, administrators, or assigns, the sum of $53,650.00, to be paid as follows: $17,833.33 1st January, 1861; $17,833.33 1st January, 1862; $17,833.33 1st January, 1863, with interest annually from the date of the bond on the whole amount unpaid, until the whole principal and any interest that may become due and unpaid shall both be paid and satisfied fully.

[On this bond the following payments were afterwards endorsed: 5th January, 1859, $3,750.50, for interest up to 1st instant; $3,750.50 10th January, 1860, interest to 1st Jan-

uary, 1860; $3,823.37 on account of interest to 1st December, 1861; and three hundred dollars on account of principal, April, 1862; $3,545.50 on account of interest for one year, and $650.00 on account of principal, January 3d, 1863; and $3,508.05 for one year's interest January 12th, 1867. Each of these endorsements was dated at Charleston, and signed by H. Laurens Toomer.]

On the said first day of December, 1857, said Tucker made and delivered to said Toomer his mortgage deed, in usual form, whereby he conveyed to said Toomer, &c., a part of the plantation named Drakie's, then lately purchased by William C. Daniel of J. A. Fraser, describing it by metes and bounds, for the purpose of securing the payment of said bond, and conditioned to be void upon such payment. This mortgage was recorded in Savannah 8th December, 1857, and in Charleston, South Carolina, 23d December, 1857. At May Term, 1866, of Chatham Superior Court, a *rule nisi* was had, calling on said mortgagor to show cause why said mortgage should not be absolutely foreclosed, and his equity of redemption be taken away.

The mortgagor for cause showed that said mortgage should be credited with the sums of money paid at the times and place stated in said endorsement; partial failure of consideration in this : that said bond was given for ninety-one negro slaves sold by said plaintiff to said defendant on the 24th November, 1857, and that on the 11th December, 1864, said slaves, or the survivors and increase of them, were captured by the military forces of the United States from out of defendant's possession, and emancipated and set at large without defendant's consent, in said county, and that afterwards, while said negroes were so out of defendant's possession, to wit: in the year 1865, by the concurrent action of the Governments of the United States and the State of Georgia, said capture and emancipation of said negroes were legalized, and thus said defendant wholly lost the property and services of said negroes; that without the fault of the defendant, and by reason of the late war between the United States and the Confederate States, and the consequent emancipation of the

slaves, it became impossible for said defendant to perform the condition of said bond, and that such impossibility was equivalent to a performance thereof to the extent of the balance unpaid thereon on the 11th December, 1864; that on or about the 16th day of September, 1864, he was able and willing to pay, and then offered to pay, said balance in the money then current in the Confederate States, but that said plaintiff refused to receive said currency, only and solely on the ground that he could not invest the amount profitably; and that defendant was then willing and ready to deliver up said slaves, or a sufficiency of them, to said plaintiff, in discharge of said balance; but that the refusal of the plaintiff to take said currency, which was then the only obtainable and circulating currency, and the terms in which said refusal was conveyed, excused said defendant from further offer to perform, under the results of said war, the emancipation aforesaid, and the destruction of said currency, except, perhaps, as to the interest due on the bond; and last, that the debt, to secure which said bond and mortgage were executed, was contracted in South Carolina, in consideration of certain ninety-one negro slaves, to wit: on the 25th November, 1857, which was to be consummated by a mortgage on said slaves, and also personal security and the mortgage on said land. The bond, with personal security, and said mortgages were so executed and delivered, the mortgage on the negroes (being executed and delivered in South Carolina) was amply sufficient to pay said debt; that said bond became forfeited on defendant's first failure to pay, and thereupon, under the laws of South Carolina, the title to said slaves vested in the mortgagee, and the loss of said slaves by emancipation should and does in law fall upon said mortgagee; and their value being sufficient to pay said debt, the debt is paid.

Upon these pleadings the parties were at issue, and trial was had January Term, 1867.

The plaintiff read in evidence said bond and said mortgage deed on the plantation aforesaid, and closed.

Defendant then read in evidence a consent agreement of counsel, as follows: " It is admitted by counsel in this case,

Tucker *vs.* Toomer.

"1st. That the agreement, bill of sale, and mortgage of the negroes, were made in the State of South Carolina, and are evidence for defendant.

"2d. That the mortgage of the negroes was delivered in South Carolina.

"3d. That the negroes were delivered in South Carolina to the defendant, and brought by him to Georgia, and were, with a slight increase, in his possession at the time they were emancipated."

And the following agreement, bill of sale, mortgage, and so forth, as follows:

MEMORANDUM.

Articles of Agreement between Henry Laurens Toomer, by his agents, Capers & Heyward, of the first part, and Captain John F. Tucker, of Savannah, Georgia, of the second part, made this 24th day of November, Anno Domini 1857— Witnesseth that the said Henry Laurens Toomer, by his agents as aforesaid, doth hereby agree to sell and deliver to the said Captain John F. Tucker ninety-one negro slaves, (as per list herewith annexed,) the names of said slaves being printed thereon singly and in families, and to pay for the said ninety-one negroes separately and singly the sum of six hundred and fifty dollars each, to be paid for as follows : the sum of five thousand five hundred dollars to be paid in cash, and the residue unpaid to be paid by bond, with approved personal security, in three installments, as follows, viz: the sum of seventeen thousand eight hundred and eighty-three dollars thirty-three hundredths—$17,883 33-100—on the first day of January, which will be Anno Domini 1861 ; the second installment, seventeen thousand eight hundred and eighty-three dollars thirty-three hundredths—$17,883 33-100 —on the first day of January, 1862 ; and the last installment of seventeen thousand eight hundred and eighty-three dollars thirty-three hundredths—$17,883 33-100—to be paid on the first day of January, Anno Domini 1863, with interest annually from the date of said bond on the whole amount unpaid until the whole principal and any interest which may

at any time hereafter become due and unpaid shall both be fully paid and satisfied. The said bond to be secured by approved personal security uniting with the said Captain John F. Tucker in the said bond, together with a mortgage of the negroes sold, and a further mortgage of his Savannah River plantation, known as "Drakie's," as a collateral security. And it is agreed between the said parties as aforesaid, that the delivery of the said negroes shall be at the plantation of the said Henry Laurens Toomer, on Ashepoo, from and after the first day of December next ensuing, and that the said Captain John F. Tucker as aforesaid shall incur the expenses of their removal.

And it is hereby further agreed by the aforesaid parties as aforesaid that the necessary papers, as usual, shall be paid by the said John F. Tucker as purchaser.

And the said John F. Tucker, of the second part, doth hereby agree to purchase the aforesaid negroes, as per list, at the price for each separately set forth as above, and to pay for, comply with, and conform to the requirements as set forth in the above agreement, in each and every particular part thereof, as above specified and set forth.

Witness our hands and seals, this 25th day of November, 1857.

H. LAURENS TOOMER.

By his agents, CAPERS & HEYWARD.

Witness:                JOHN F. TUCKER.

E. T. BURDELL.

I hereby, also, personally agree to and confirm the above articles of purchase and sale, as made by my agents for me and in my name.

Witness:             H. LAURENS TOOMER.

P. D. MORCOCK.           January 14th, 1858.

THE STATE OF SOUTH CAROLINA.

*Know all men by these presents:*

That I, Henry Laurens Toomer, of the City of Charleston, in the State aforesaid, for and in consideration of the sum of fifty-nine thousand eight hundred dollars, to me in

hand paid, at or before the sealing and delivery of these presents, by John F. Tucker, of the City of Savannah, in the State of Georgia, (the receipt whereof I do hereby acknowledge,) have bargained and sold, and by these presents do bargain, sell, and deliver to the said John F. Tucker, the following named ninety-two negro male and female slaves, viz : (stating their names.)   To have and to hold the said slaves as above named and numbered, together with the future issue and increase of the females, unto the said John F. Tucker as aforesaid, his executors, administrators, and assigns, to him and his only proper use and behoof forever. And I, the said Henry Laurens Toomer as aforesaid, my executors and administrators, the said bargained premises unto the said John F. Tucker as aforesaid, his executors, administrators, and assigns, from and against all persons, shall and will warrant and forever defend by these presents.

· In witness whereof I have hereunto set my hand and seal. Dated at Charleston, on the twenty-fourth day of November, in the year of our Lord one thousand eight hundred and fifty-seven, and in the eighty-second year of the sovereignty and independence of the United States of America.

· · H. LAURENS TOOMER.   [L. S.]

Signed, sealed, and delivered in the presence of

Wm. E. Simmons,

Philip S. Postell.


## THE STATE OF SOUTH CAROLINA.

*To all to whom these presents shall come,*

I, John F. Tucker, of the City of Savannah, in the State of Georgia, send greeting :

Whereas, I, the said John F. Tucker, as aforesaid, in and by my certain bond or obligation, wherein Henry J. Dickerson is named as surety, bearing date even with these presents, stand firmly held and bound unto Henry Laurens Toomer, of the City of Charleston, in the State aforesaid, in the penal sum of one hundred and seven thousand three hundred dollars, ($107,300,) with a condition thereunto written, for the payment of the full and just sum of fifty-three thousand six

hundred and fifty dollars, ($53,650,) as in and by said bond and condition thereof, reference being thereunto had, will more fully and at large appear :

Now know ye, that I, the said John F. Tucker, as aforesaid, for the better securing the payment of the said sum of fifty-three thousand six hundred and fifty dollars ($53,650) unto the said Henry Laurens Toomer, his heirs, executors, administrators, or assigns, together with lawful interest for the same, I, the said John F. Tucker, as aforesaid, have bargained and sold, and by these presents do bargain and sell, and in plain and open market deliver unto the said Henry Laurens Toomer as aforesaid, the following named ninety-one negro male and female slaves, to wit: (giving their names and ages.) To have and to hold the said slaves, as above named and numbered, together with the future issue and increase of the females, unto the said Henry Laurens Toomer as aforesaid, his executors, administrators, and assigns forever.

Provided, always, nevertheless, that if the said John F. Tucker and Henry J. Dickerson as aforesaid, or either of them, their or either of their heirs, executors, or administrators, shall and do well and truly pay or cause to be paid unto the said Henry Laurens Toomer as aforesaid, his certain attorney, executors, administrators, or assigns, the full and just sum of fifty-three thousand six hundred and fifty dollars, ($53,650,) according to the true intent and meaning of the bond aforesaid, and of these presents, together with lawful interest, then this deed of bargain and sale, and all and every clause, article, and thing therein contained, shall cease, determine, and be utterly void and of none effect, anything hereinbefore contained to the contrary thereof, in any wise, notwithstanding.

And it is hereby declared by and between the said parties, and the said John F. Tucker as aforesaid, his executors, administrators and assigns, doth covenant, promise and agree to and with the said Henry Laurens Toomer as aforesaid, his executors, administrators and assigns, by these presents, that if default shall happen to be made of or in payment of the

Tucker *vs.* Toomer.

said sum of fifty-three thousand six hundred and fifty dollars ($53,650) as aforesaid, according to the true intent and meaning of the bond aforesaid, that then, in such case, it shall and may be lawful for the said Henry Laurens Toomer as aforesaid, his executors, administrators, attorneys or agents, from time to time, and at all times hereafter, peaceably and quietly to enter into any or all the messuages, lands or tenements of the said John F. Tucker as aforesaid, and to take the aforesaid negro male and female slaves and their increase into his custody and possession, and the same to hold and detain to his own use and behoof (as his own proper goods and chattels) from thenceforth and forever, or the same to sell and dispose of at will and pleasure; returning the overplus, if any should happen to be, after paying the said sum of fifty-three thousand six hundred and fifty dollars, interest, costs, and charges of collection, unto the said John F. Tucker as aforesaid, his executors, administrators, or assigns.

In witness whereof, I, the said John F. Tucker as aforesaid, have hereunto set my hand and seal, this first day of December, in the year of our Lord one thousand eight hundred and fifty-seven, and of the sovereignty and independence of the United States of America the eighty-second year.

JOHN F. TUCKER, [L. S.]

Signed, sealed and delivered in presence of:

JOHN COOPER.

R. F. AKIN, Notary Public C. C.

This mortgage was duly certified by a Commissioner of Deeds for South Carolina, (at Savannah,) and was recorded in Secretary of State's office in South Carolina, 23d December, 1857.

The said defendant here closed his case, whereupon the said plaintiff, as rebutting evidence, offered the following letters, which were read to the jury:

SAVANNAH, January 2, 1860.

H. LAURENS TOOMER, Esq.

*Dear Sir* :—I was in hope to-day I could have sent to you the amount of the interest due on the 1st inst. The weather

10

has been very rainy for four or five days past, and I came into town through a heavy rain to-day, expecting to get money enough for sales of rice to have forwarded to you the amount due you for interest, but my factors could not advance me a dollar. Sales of rice are almost impossible to be effected, and they do not know who would pay if sold to, but I have directed them to sell if possible, and hope in a few days to be able to forward you the amount.

It is with feelings of sincere regret that I am compelled to say that it will be impossible for me to reduce the principal of my indebtedness to you. I regret it the more, as when I made the purchase I made it in good faith, expecting the instalments as they became due would be promptly met; but a series of misfortunes have befallen me since I made the purchase, and it is now only a question of time, which, if you will give me, will enable me to pay you all, and as these are troublous times we have fallen on, and an unparalleled commercial pressure, it is impossible to raise a dollar. I am compelled consequently to throw myself on your magnanimity and generosity, nor am I desirous that you should do so without being paid for it, and it will be much better than stocks or any other security at this time to invest in. I propose to pay you in addition to the legal interest, $2\frac{1}{2}$ per cent. on all amounts of principal that I fail to pay when they become due, I giving you my note, payable on the first day of January, when the interest becomes due, say for the excess of interest the ensuing year, which would be considered in the light of commission, not interest, for advancing $447 48-100, and so on for all amounts of principal not paid at maturity, would make the amount to pay you next January $4,-202 58-100 instead of $3,755 50-100, making the investment equal to $9\frac{1}{2}$ per cent. on all amounts of principal due. As I said before, it is merely a question of time, and I am not disposed you shall be the loser for a single dollar. It now rests with yourself whether I am ruined or aided along by your kindness, and should beg in these times your sympathy. I have considerable amount of money due me from parties here, but the appeals have been made to me, and I cannot

Tucker *vs.* Toomer.

find it in my heart to press them, (even if the law did not prevent it,) when there is no demand for what they have to sell nor money to buy with ; and as all seem to be struggling to vindicate our rights in the South, I trust that God will soften the hearts of all who hold the prosperity of another in their hands. Hoping that Georgia will soon follow the patriotic and noble example of South Carolina,

I am yours, very respectfully,<br>
JOHN F. TUCKER.

Indorsed :
H. LAURENS TOOMER, Esq.,<br>
Charleston, S. C.

SAVANNAH, January 8th, 1861.

H. LAURENS TOOMER, Esq., Charleston.

*Dear Sir :*—Yours of the 4th instant came to hand this morning and contents noted. It is with sincere regret that I am compelled to say that in times like the present I cannot raise a dollar beyond the settlement of the interest due, which shall be paid in a very short time. You ask me to write you and let you know what arrangements I can make towards the settlement of the bond now due. I cannot raise the money without the sale of property. I cannot sell, for there are no purchasers, except at a price, in times like these, that some hard-hearted old usurer would stand and gloat over the large gains he might make because he had held his money to take advantage of just such times as the present. Deeply regretting the position my failure to pay has placed you, I have suffered ten thousand times more than the whole concern is worth, for the reason that I could not pay the money or help myself. When I pay the interest now due, it will make some over $17,500 I have paid you in principal and interest, and I trust you will take such a view of the case as will enable us to get along amicably in this matter. I assure you it would afford me more pleasure to pay you, if I had the money, than to withhold it ; in fact, more than to receive it, if I did not need it to pay a debt. I desire to do what is right, and will do so to the utmost of my power. You shall

not lose one dollar, although it may inconvenience you to wait. I am, as I said before, desirous to pay you, but it is impossible for money to be raised at the present time, consequently can do nothing.

I am yours, very respectfully,

JOHN F. TUCKER.

The evidence being here closed, and the parties being at issue on the aforesaid petition and the objections of said defendant thereto, and especially the fifth objection in the record of said suit stated, the cause was argued on behalf of the said petitioner Henry L. Toomer, and the said defendant John F. Tucker; the attorneys for the said John F. Tucker arguing and insisting that the aforesaid agreement for sale of negroes, the said bond, the said sale of negroes, and mortgage of negroes, became and were a contract made in and governed by the laws of South Carolina in its construction, application and enforcement; that the said mortgage on land was only collateral or auxiliary to said contract in regard to the negroes; that, after default made by the said mortgagee of the negroes, the title to said mortgaged negroes ceased to be conditional, and became absolute in said mortgagee, Henry L. Toomer, according to the said law of said contract, to-wit, the law of the State of South Carolina; and that, consequently, the loss of the value of said slaves, by their emancipation, without the fault of said mortgagor, should fall on the said mortgagee, to the extent at least of the value of the legal title to said slaves, and should not fall on said mortgagor.

The argument on both sides having closed, the Judge charged the jury, amongst other things stated in the following motion, that whilst the law of the place of the contract should govern, yet it did not follow that the loss by emancipation of said slaves should fall on the mortgagee, who became the legal owner on condition broken, and that the loss which said mortgagee suffered by said emancipation was only his mortgage security on the slaves, and not the loss of the debt. Whereupon, the jury retired and found for said

Tucker *vs.* Toomer.

plaintiff that the rule *nisi* on said petition for foreclosure be made absolute.

John F. Tucker, by his attorneys, moved for a new trial on the following grounds :

1st. Because said verdict was contrary to law.

2d. Because said verdict was contrary to evidence.

3d. Because said Court erred in charging the jury that the loss of slaves by the act of emancipation did not fall upon the legal owner.

4th. That the Court erred in charging the jury that, to fasten the loss upon the owner, he must have not only the legal but the beneficial interest.

5th. Because the Court erred in charging the jury that, when, under the law of Carolina, the mortgagee became the legal owner by breach of condition, he holds as trustee for the mortgagor.

6th. Because the Court erred in charging the jury that, when, under the law of South Carolina, the property became vested in the mortgagee, the loss of the property so vested did not cancel the debt to the extent of the property so lost.

7th. Because the Court erred in charging the jury that upon the facts agreed upon and the law as given them in charge, they must find for the plaintiff.

8th. Because the Court erred in charging the jury that, although, in the case of emancipation of slaves, the loss should fall upon the parties in interest in proportion to their interest, yet in this case that the loss should fall entirely upon the defendant, John F. Tucker.

The new trial was refused.

To which decision overruling said motion for new trial, the said John F. Tucker, by his attorneys, excepted, and assigns for error—

1st. That said Judge erred in refusing said motion for new trial, under the evidence in said cause.

2d. That said Judge erred in refusing said motion for new trial, under the law applicable to said cause.

3d. That said Judge erred in refusing to grant a new trial under the law and the evidence in said cause.

4th. That said Judge, whilst admitting, in said written decision, that said mortgage on negroes was a South Carolina contract, governed in its construction by the laws of South Carolina, which, on condition broken, vest the legal title to the mortgaged property in the mortgagee, yet erred in refusing said motion for new trial, and in deciding that the loss of the value of said negro slaves by emancipation should fall wholly on said John F. Tucker, under all the facts and circumstances in said cause.

5th. That said Judge, in said decision, erred in deciding that in said cause the mortgagee was or could be the trustee of the mortgagor, after condition broken as aforesaid.

6th. That said Judge, in said decision, erred . in deciding that the loss of the value of said negro slaves, by emancipation, ought rightfully to fall on said John F. Tucker as mortgagor, and not on said Henry L. Toomer as mortgagee.

7th. That said Judge erred in refusing said motion for new trial in said cause.

HARRIS, J.

The principles involved in this case were decided in Bass *vs.* Freeman, 34 vol. Ga. Repts., p. 369.

In that case it was contended by counsel of Bass, that the instrument executed by him was a mortgage under the laws of ARKANSAS; that by the laws of that State, that, upon condition broken for the payment of the purchase money,— the title to the negroes ceased to be conditional, but became absolute in Freeman, and consequently as the legal title was in Freeman at the time of the emancipation of the slaves by war, the loss of the value thereof should, as there was no fault in mortgagor in causing their emancipation, fall upon the mortgagee, or at least in equity, be apportioned between the parties. The written opinion of Judge Walker does not entirely cover all the points made and considered and passed upon by the entire Court, or it would have been readily perceived by plaintiff in error here, that all the material questions made by his bill of exceptions, had been adjudicated.

With what has been said, we might appropriately stop;

but it may not be without value to add a remark or two ;—they will have accomplished some useful end, should they elicit professional thought and investigation.

It occurs to us that the fundamental vice of the whole claim of Tucker to relief, is founded upon the assumption that the sale of the negroes to him was *conditional*, and that an *absolute title*, free from any equity of redemption, revested upon breach of payment by him—in Toomer the vendor.

Even had the South Carolina mortgage in this case contained the most stringent agreement for the exclusion of interference by a Court of Chancery, as by taking away the equity of redemption, that Court will never permit such an agreement to prevail, or any agreement which would change a mortgage into an absolute conveyance, upon any condition or event whatever.   Howard *vs.* Harris, 1 Vernon, 190 ; Leton *vs.* Shade, 7 Vesey, 273 ; Williams on Real Property, 355–6, top page.

In this we discover an adherence to the old law maxim, "Once a mortgage, always a mortgage."

The whole equity of the mortgagor Tucker, consisted in, 1st, his equity of redemption, and 2d, in the right (had possession of the negroes been taken by Toomer and a sale made of them under the covenant allowing such sale, or under foreclosure,) to the excess of money raised over and above the payment of the debt, principal, interest and costs, to the mortgagee.

We conclude what we have to say by a quotation from Chancellor Kent's Com. 4 vol., 157, as it covers the entire reasoning upon which the Bass case and this were decided.

" In ascending to the view of a mortgage in the contemplation of a court of equity, we *leave all these technical scruples and difficulties behind us.*   Not only the original severity of the common law, treating the mortgagor's interest as resting on the exact performance of a condition, and holding the forfeiture or the breach of a condition to be absolute by non-payment or tender at the day, is entirely relaxed ; but the narrow and precarious character of the mortgagor at law, is changed under the more enlarged and liberal jurisdiction of

the courts of equity—*their influence has reached the courts of law,* and the case of mortgages is one of the most splendid instances in the history of our jurisprudence, of the triumph of equitable principles over technical rules, and of the homage which these principles have received, *by their adoption in the courts of law.*

The opinion of Judge Fleming, pronounced in overruling the motion in this case for new trial, is so marked by vigorous logic and sound common sense, that we append and adopt it as fully, expressing the reasons by which we are influenced in affirming his judgment.

OPINION OF JUDGE FLEMING.

HENRY L. TOOMER *vs.* JOHN F. TUCKER.    Motion for New Trial.

This motion for new trial having been submitted without argument, I propose to do little more than to give the substance of my charge to the jury,—from which it will appear whether the exceptions to my charge, and which exceptions are the ground upon which this motion is made, are well founded.    I charged the jury

1st. That the mortgage of the negroes, introduced as evidence in the cause for the purpose of proving payment, and upon which the argument has been made, is a South Carolina contract.

2d. That, being a South Carolina contract, it is governed in its construction by the laws of South Carolina.

3d. That by the laws of South Carolina, in a mortgage of personal property upon condition broken, the *legal* title to the property mortgaged, becomes vested in the mortgagee.

4th. That this vesting of the legal title in the mortgagee, does not operate *eo instanti* as a payment of the debt due on the mortgage, but is intended to give the mortgagee control of the property, so as to enable him with more ease and facility, speedily to collect his debt by applying the property, or so much of it as might be necessary for that purpose.    That until such application was made, there was no payment.    I

don't mean that the mortgagee upon taking possession of the property, may be negligent in the use of his power to apply it to the payment of his debt.    If loss accrues by reason of his negligence, he would doubtless be answerable for such loss.    I am now only controverting the position of defendant's counsel, *that condition broken operates as payment.*    I say that it gives him control of the property for the purpose of enabling him the more speedily to apply it to the payment of the debt.    If he proceeds with due diligence to do this, it is then and then only, that the payment is consummated.    If loss occurs without his fault, it must fall on the mortgagor. Suppose that upon condition broken, the mortgagee proceeds at once to assert his rights, he takes possession of the property, but before he could advertise and sell, the negroes die; would his debt be paid?    Assuredly not.    Substitute emancipation for death, and where is the difference?    In either case he fails to realize anything, and surely he cannot be made to credit more than he does realize, unless the failure to realize has been the result of his own conduct.    Now if such be the case where the morgagee proceeds with all the diligence he can, to assert his legal rights by taking possession of the property, how much stronger is the case for him, when he abstains from the assertion of his legal rights and suffers the property to remain in the possession of the mortgagor, at his (the mortgagor's) own earnest request.    If death or emancipation, while in the hands of the mortgagee and before he could realize, relieves the mortgagee from the obligation to give credit on his debt, then surely he is relieved from all obligation to give credit, if death or emancipation occurs while the property is in the hands of the mortgagor, and in his hands at his (the mortgagor's) request.

Again, suppose that the mortgagee finds it impossible to take possession of the property, as may happen if the property is in the hands of a third party under purchase from the mortgagor, in such a case he may have to institute a suit,— is he bound to give credit before recovery had?    Assuredly not. But *he is bound* to give credit if it be true that the debt is paid on condition broken.    In such a case, the mortgagor,

with the price of the negroes in his pocket, is entitled to be credited again with their value on the mortgage.    There is no escape from this result, if the position of the defendant's counsel be right.

I would not speak disrespectfully of any position taken by the learned counsel who represent the defendant in this case, but I must say that I have no patience with this argument. It seems to me to be an outrage alike upon common sense and common justice.

That I am right in the views I have expressed, is evident from the practical operation of the law in South Carolina. What is the course pursued in South Carolina in the collection of debts of this kind?    So far as I am informed, the course is this: *upon condition broken* the mortgagee either proceeds himself, or if he chooses, he places his mortgage in the hands of the sheriff or of some friend, who takes possession of the mortgaged property, to sell it and credit the net proceeds of the sale.    If the property sells for less than the debt, the mortgagor is still liable for the deficiency; if it sells for more than the debt, the overplus goes to the morgagor. This I understand and believe to be the usual proceeding in South Carolina.    If I am not mistaken in this, then clearly condition broken is not regarded as payment, although by the law of that State, condition broken vests the fee in the mortgagee.    For if it be payment, then there can be no deficiency for which the mortgagor is still liable,—and if there be an overplus, the mortgagor would have no right to it.    In one word, if the mortgaged property is the property of the mortgagee in the absolute sense contended for by counsel,—then the money for which it sells would also be absolutely his, and there would be no obligation to pay over the surplus.    What better proof do we want that the vesting of the legal title in the mortgagee, is simply for the purpose of enabling him more speedily and effectually to collect his debt?    To this extent the mortgagee is but the trustee of the mortgagor, and the trust becomes executed when the property, or so much of it as may be necessary, has *been applied to the payment of the debt.*    If before this is done, loss occurs without the fault of

Tucker *vs.* Toomer.

the mortgagee, by death or emancipation, it does not fall upon the mortgagee; for up to that moment the debt is unpaid, and remains unpaid unless the death or emancipation of the negroes, has the effect of payment.    It does not necessarily follow that the loss must fall upon the mortgagee, because under the law he is the legal owner; for, though he be legal owner, he is made so for a special purpose.    It has been harped on in the argument, that the loss must fall on the legal owner; that I at this very term so decided.    In the case referred to, the legal owner was the *absolute* owner,—not the legal owner for a particular purpose.    He not only held the legal title, but he had the beneficial interest.    An executor or administrator is the legal owner of the personal property of the estate; but if a negro dies or is emancipated, who loses—the executor or the heirs and distributees of the estate? Loss, then, does not necessarily follow the legal title.    That the vesting of the legal title in the mortgagee does not operate as payment, is evident also from this; that if it be true, then when a mortgage of personal property has been taken to secure a debt, it destroys every other security that a creditor may have, and puts it out of his power to add to his security.    Suppose for example that the creditor has in addition to his mortgage, taken personal security, as I believe was done in this case, he could never make that personal security liable.    Why?    Because, so long as the conditions of the mortgage were complied with, every installment paid as it fell due, he would have no right of action,—and upon *condition broken*, he would have no right to proceed against the security, *for then the debt would have been paid*.    In other words, the failure to pay is *payment*.

I want no stronger argument against the proposition of counsel than is contained in the proposition itself.    Let me present another view, to show that the legal title vested in the mortgagee by condition broken does not create that absolute ownership which would cast the loss by emancipation on him.    If under certain circumstances he is to be prejudiced, then under certain other circumstances he ought to be benefited.    " It is a bad rule that don't work both ways."    If the

Tucker *vs.* Toomer.

mortgagee is to lose all by emancipation, when it would take all to pay his debt, then if there had been no emancipation and the property was more than sufficient to pay his debt, he ought to gain the excess. Why should he lose in the one case and not gain in the other? If there had been but one thousand of this fifty thousand dollars remaining unpaid, the failure to pay that one thousand dollars would vest that legal title in him as fully and effectually and absolulely as the failure to pay fifty thousand dollars. If in the one case he is to lose the ninety negroes, in the other he ought to gain them. The truth is, that either proposition is monstrous. All this absurdity is avoided if what I contend for be true—that the legal title is vested in the mortgagee for the purpose of enabling him to collect his debt. He is bound to account to the mortgagor for such amount as he may realize from the property. I care not whether this accountability is at law or in equity; it is enough for my argument that he is accountable. If the property more than pays his debt, he is liable for the excess. If it falls short of paying his debt, the mortgagor is still liable for the deficiency. This must be law, for it is justice.

I grant that if loss occurs by reason of the neglect or fault of the mortgagee, he is responsible. But nothing of the kind has been shown in this case. Neither party is in fault. True, the mortgagee did not assert his legal right immediately on condition broken; but it is also true that the mortgagor earnestly appealed to him for indulgence. The negroes were allowed to remain with the mortgagor at his own request, and were in his possession when emancipation came. The result, to my mind, is very clear; the mortgagee has lost his *security*, the mortgagor his means of payment, so far as that security. or those means depended on the negroes mentioned in the mortgage.